**Gerald TANKERSLEY, Appellant,**

**v.**

**Dillie GILKEY, Appellee.**

Court of Appeals of Kentucky.

Feb. 10, 1967.

Rehearing Denied June 2, 1967.

Earle M. Nichols, Nichols & Nichols, Madisonville, for appellant.

Carroll S. Franklin, Franklin & Gordon, Madisonville, for appellee.

HILL, Judge.

Dillie Gilkey sued Gerald Tankersley in Hopkins Circuit Court according to Chapter 188 of Kentucky Revised Statutes for damages she claimed resulted from an automobile accident which occurred in Hopkins County on October 13, 1960. Appellant Tankersley was at all times mentioned herein a resident of Oxford, Alabama.

A letter from the Secretary of State of the Commonwealth of Kentucky and a copy of the petition were mailed to appellant by properly registered mail but were returned marked "refused." The suit was filed September 21, 1961, and summons was served on the Secretary of State on September 25, 1961. No steps were taken by Gilkey for some time, but on the following May 12, 1962, Tankersley, claiming he received information of the filing of the suit in a "round-about way," filed motion to quash the summons. After an oral hearing, at which the court announced from the bench the overruling of Tankersley's motion to quash, the judge signed an order "on the book," but neither the judge nor circuit clerk furnished copies to Tankersley or Gilkey or their attorneys so far as this record

discloses. However, it appears that the order was noted on the civil docket.

Counsel for Tankersley contends he kept a watch on the court file to determine whether and when the judge "signed" an order overruling his motion to quash, but the court file never contained such an order because, as noted above, the clerk "wrote the order" on the order book and the judge subscribed his name on the order book.

Counsel for appellant took no further steps after filing the motion to quash on May 12, 1962, until September 27, 1962, when he served notice that on September 29, 1962, he would renew his motion to quash.

On October 1, 1962, the judge signed another order overruling appellant's motion to quash, and on the same date signed an order adjudging appellant to be in default and taking the allegations of the complaint as confessed except as to the amount of damages. Thereupon appellant hastened to serve notice on the appellee that he would file motion on October 6 for permission to file answer. This motion was not heard for some unimportant reason. Again, on October 8, appellant served another notice that on October 9 he would file motion to be permitted to file answer. This motion was overruled on October 10. Later the case was tried by a jury on the amount of damages only.

One of the main arguments advanced by appellant in this court questions the correctness of the order of the circuit court refusing to set aside the default judgment and allow appellant to file answer. It was the conclusion of the trial judge that appellant was in default on May 12, 1962, for failure to show excusable neglect.

■ Since the adoption of our present rules of procedure, the clerk is required to keep a book known as the civil docket (CR 79.01), on which notations are kept of all steps taken in the case. He is also required by CR 79.02 to "keep" a "book in which shall be copied every judgment and order of the court." Clearly, this last section contemplates that judgments and orders shall be signed by the judge on separate paper and delivered to the clerk, who "copies" such orders on the "book." The judge is not required to sign this book. CR 79.02 goes on to state: "The clerk shall subscribe his attestation to the effect that the judgments and orders are true copies. The judge need not sign the book * * *." It should be noted that the rules do not say the judge may not sign the book, but that he "need not" sign it.

■ The order of May 12 was not signed and entered in strict conformity with civil rules. However, an order was "entered" on the order book and signed by the judge. The circuit clerk also entered the proper "notation" on the civil docket as required by CR 58; this, we think, was a substantial compliance with the requirements of the rules here involved.

■ Furthermore, the record herein reveals appellee's motion for default judgment was served on appellant on June 14, 1962. The filing and serving of this motion for default constituted further notice to appellant that counsel for appellee was under the impression the order had been theretofore properly entered.

■ The provision of CR 4.10 allowing defendants constructively summoned some grace in the presentation of their defense does not apply to the present case. Appellant was not constructively summoned. The manner of service of process on nonresidents of this State in automobile accident cases is authorized and justified on the proposition that nonresidents using the highways consent to the constitution of the Secretary of State as their agent for the service of process. Statutes of this character have been uniformly adopted by practically all the states of this Union. The procedure for getting a nonresident before the court is a reasonable and practical one considering the large volume of inter-

state traffic. A nonresident involved in a collision in this State certainly knows about it and he may anticipate being sued. Indeed, we think it would not be unreasonable to impose some duty of inquiry. In the present case, appellant was summoned according to law in September and did not make an appearance in the action until the following May.

We conclude appellant did not show "excusable neglect" for his failure to file answer and present his defense as required by the rules of civil procedure discussed herein. We cannot say that the trial judge abused his discretion in granting default judgment and in declining to set it aside and allow appellant to file answer.

Next, appellant assails the verdict of $7,208 as excessive.

Appellee was sixty-four years of age when she testified in May 1965. There is scant evidence of the manner in which she received her claimed injury; she only said her neck was "hurt." The only evidence pertaining to the manner in which she received injury is her own testimony that the right side of her car was damaged. It is assumed, therefore, that her car was not struck in the front or rear and that her claimed injury was not likely a "whiplash" injury. She remained at the scene of the accident for about an hour and then drove her car home, a distance of about twenty-five miles. It was four days before she went to Dr. O. E. Hudson, a chiropractor. He admitted she had received no broken bones or lacerations due to the accident.

Dr. Hudson gave appellee 141 "adjustments" from October 17, 1960, until the date of the trial on June 27, 1965. He took X-rays, which were studied and commented upon by appellant's physician, Dr. George E. Ainsworth.

Appellee was referred to Dr. John E. Harned for glasses and for an examination of her right eye. He testified that he fitted appellee with glasses and corrected her trouble; that she had a "Horner's syndrome" of the right side, which was evidence of trouble "somewhere else," but that her eyesight was "normal"; that the "Horner's syndrome" could have been caused by arthritis in the cervical spine or by the pronounced chronic curvature of the spine. When he last examined appellee, the syndrome had disappeared.

Appellee was also referred to two physicians in Nashville, Tennessee, but from her testimony they were of no help to her because she could not take their medicine as it caused her to go "backward" and fall. They did not testify.

Dr. Ainsworth was introduced as a witness for appellant. He testified after an examination of appellee and the X-rays taken by Dr. Hudson. He stated that "there was no evidence of any acute or remote injury to the cervical spine, the region of the spinal column in the neck"; there was no evidence of misalignment or subluxation of the first vertebra below the skull or in that area at all; that the X-rays did disclose a severe deformity of the neck, a marked increase in the normal bend of the neck of "almost ninety degrees," which "results in a very high humpback which mechanically forces the head and neck forward"; that this condition takes "many years to develop"; that it could have been congenital, "even taking the patient's entire life to develop, having started with a mild deformity from birth"; that this condition produces an "abnormal stress and strain on the muscles and ligaments and joints * * * and will get progressively worse as the years go on"; that he thought, from the X-rays, "because of this curvature and the abnormal motion of the joints, the patient was developing wear-and-tear arthritis in her upper thoracic spine, and also in the lower portion of her cervical spine." He also stated: "It is my opinion that the arthritis that we see in her neck and in the upper portion of her back are directly due to the mechanical deformity in the neck, with con-

stant wear and tear on these abnormally placed joints."

Appellee stated that she had had this condition (curvature of the neck) all of her life.

Dr. Ainsworth also stated:

"We see perhaps fifty such cases each year, and I have never seen a Horner's syndrome as a result of this (lashing injury) type of injury. * * * I had to base my evaluation of the patient on her history, the physical examination as it was at that time, and the X-ray findings, and it was my conclusion that all the symptoms, the pain, stiffness and difficulty the person has could be directly related to the abnormality of her spine, and the arthritis which she had, and I could not directly relate her symptoms or findings at that time with any injury in the patient. * * * I never recommend any type of chiropractic manipulation or treatment of any sort—knowing what I know, I would not."

It is fair to assume that the abnormal curvature of appellee's neck did not suddenly result from a traumatic injury.

It is written in Lincoln Income Life Ins. Co. v. Mann, 297 Ky. 681, 180 S.W.2d 877 (1944) that:

"Therefore, the observations of lay witnesses as to the appearances and activities of the one so afflicted is insufficient to contradict the professional testimony on that issue."

There is grave doubt that plaintiff's evidence is sufficient to prove that her claimed injury was the proximate cause of her condition. Aside from this question, we conclude from the evidence the amount of the verdict was excessive.

Appellant's final charge against the verdict and judgment relates to instruction one, authorizing the jury to award damages for "permanent" disability. The charge is a double-barreled one. First, it is said the instruction is objectionable because it assumes there was an injury. The allegations of the complaint, except as to the amount of damages, were taken as confessed by the default judgment. Hence, the first barrel is loaded with a blank cartridge. Second, it is said the evidence was insufficient to authorize the giving of an instruction on permanent impairment of her power to earn money. Dr. Hudson testified that in his opinion appellee sustained permanent injuries. In view of appellee's testimony and the length of time from the injury to the trial date, we conclude there was sufficient evidence to authorize the giving of an instruction on permanent impairment of appellee's power to earn money. The second barrel, like the first, was harmless.

The judgment is reversed with directions to grant appellant a new trial on the question of damages.

All concur.